STATE OF MAINE                                          SUPERIOR COURT
SAGADAHOC, ss.                                          CRIMINAL ACTION
                                                        Docket No. CR-06-125


OLLAND REESE,

        Petitioner,

v.                                                      ORDER

STATE OF MAINE,

        Respondent.


Before the court is a petition for post conviction review filed by Olland Reese, who was convicted of the murder of Cody Green in July 2003. *State v. Reese*, CR-02-73. Reese's conviction was affirmed by the Law Court on June 30, 2005, *State v. Reese*, 2005 ME 87, 877 A.2d 1098, and Reese thereafter brought this petition for post conviction review.

A hearing was held on October 10 and November 6, 2008. At the time of the hearing counsel for Reese stipulated that he was pursuing only the two grounds set forth in paragraphs 1(a) and 1(b) of his Revised Amended Petition for Post Conviction Review dated June 16, 2008 and filed June 27, 2008. Both of those grounds allege that Reese's trial counsel failed to adequately investigate and offer forensic evidence and expert testimony with respect to a piece of duct tape that was found wrapped around Cody Green's wrists when her body was discovered.


    1.      Post Conviction Review

        On a claim that counsel was ineffective, the petitioner has the burden of proving both ineffectiveness and prejudice. Specifically, the petitioner must demonstrate (1) that there was serious incompetence, inefficiency, or inattention of counsel amounting

to performance below what might have been expected from an ordinary fallible attorney; and (2) that such ineffective representation likely deprived the petitioner of an otherwise available substantial ground of defense. *McGowan v. State*, 2006 ME 16 ¶¶ 11-12, 894 A.2d 493, 496-97.

In connection with the second prong – that ineffective representation likely deprived the defendant of an otherwise available ground of defense – the petitioner must show, in the context of a trial, that counsel's ineffectiveness likely affected the outcome of the trial. *Id.* ¶ 13, 894 A.2d at 497. As the U.S. Supreme Court noted in *Strickland v. Washington*, 466 U.S. 668, 694 (1984), the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

2. Evidence at Trial

In brief, the following evidence was offered at trial:

Cody Green, who was 16 years old at the time of her death, disappeared on May 26, 2002. She was reported missing three days later. On June 25, 2002 her body was found in the woods in Bowdoin, Maine, on property adjoining the residence where Reese was living, which was owned by Reese's mother.

At the time in question, Reese was 19 years old. He was living in the Bowdoin residence with his 15-year-old girlfriend, Kara McGinnis, who was a good friend of Cody Green's. A cabdriver testified that he had taken Green to Reese's residence and dropped her off in the late afternoon on May 26. He testified that when he dropped her off, a young man came out to meet her. There was evidence that Reese was the only one home that afternoon.

Green's body was found a month later in a shallow grave approximately 150 yards through the woods from the residence where Reese was living. Investigators from the warden's service testified that there was evidence of a faint track from the burial site to the residence. A search of the residence and subsequent forensic testing revealed the presence of a significant amount of Green's blood on a futon in the residence and a smear of her blood on the wall near the back door. Green had been killed by blunt trauma to the head, and DNA from Green was found on the blunt end of a hatchet in the residence. Finally, Green's body was wrapped in a sheet that was identified as having been on the futon in the residence the night before Green disappeared, and Green's wrists were bound with duct tape that was consistent with a roll of duct tape that was found in the residence.[1]

Reese never acknowledged that he had any involvement in Green's death, but he provided multiple and inconsistent stories as to the events of the day she disappeared. Initially, he denied that Green had ever come to his residence that afternoon. At a later point, however, he told officers that Green had come to the residence on May 26 but, once she learned that Kara McGinnis was not there, had walked out to the road and turned toward Lisbon. At another point Reese said he had not seen Green although he had seen a taxicab in the driveway.

On the issue of motive, the State offered evidence that Reese had not liked Cody and had discouraged McGinnis from spending time with her. There was also evidence that Green had recently given Reese $50 to buy cocaine and that as of May 26 Reese had not obtained the cocaine as promised. The State argued at trial that there were several possible motives for Green's murder: (1) that it stemmed from Reese's known

---

[1] The parties stipulated, however, that the duct tape found on Green's wrists and the duct tape found in the residence is a type of duct tape commonly sold in Maine.

3

antipathy to Green; (2) that Green had gone to Reese's residence to get the cocaine she expected or her money back and that an altercation had ensued; or (3) that Reese had made a sexual advance that Green had resisted.[2]

One item of evidence that played a significant role at trial concerned a fingerprint on the duct tape that was found wrapped around Green's wrists. From the testimony and the photographs presented at trial, it appeared that there were six lengths of duct tape around Green's wrists (preserved, unwrapped, as State's Trial Ex. 31) although the sixth wrap was not placed on top of the proceeding wrap but was left as a twisted end. *See* State's Trial Exhibit 24 (photograph). A partial finger or hand print was found on the inside (sticky side) of the fifth wrap of duct tape, and that print was subjected to painstaking analysis by fingerprint technician Kim Stevens. She determined that the print did not match Olland Reese. It also did not match persons whom Reese's trial counsel had proposed as alternate suspects. The State argued at trial that the most probable source of the print was Cody Green. However, the State was unable to locate a set of Green's prints for comparison, and her body was too badly decomposed to yield any finger or hand prints.

Thereafter, the area of the tape where the partial print was found was subjected to DNA analysis by forensic analyst Cathy MacMillan. However, the only identified DNA that was found was that of Kim Stevens, the fingerprint technician.

At trial the defense highlighted this instance of contamination and argued generally that this rendered all of the State's DNA and blood evidence unreliable.

---

[2] There was no evidence of any sexual assault, although when Green's body was found, her trousers were partially unzipped.

4

3.    Post Conviction Proceedings

Reese's post conviction petition was filed on June 29, 2006. A post conviction assignment order was entered on August 24, 2006. Petitioner thereafter moved for a 60-day extension of time in which to file an amended petition. The amended petition dated November 3, 2006 raised – as a new ground – that trial counsel had failed to present expert testimony concerning the fingerprint found on the duct tape. Amended Petition ¶ 1(c).

At the same time counsel for petitioner requested a further extension of time to investigate the case and, if necessary, further amend the petition. This motion was unopposed and was followed by two additional requests for enlargement. On May 29, 2007 counsel for petitioner filed a second amended petition adding in paragraph 1(i) that trial counsel had failed to retain an expert to audit the results of the State's DNA testing and have independent DNA tests performed. Amended Petition dated May 29, 2007 ¶ 1(i).

Subsequently petitioner filed a motion for expert funds and thereafter obtained a further unopposed extension of time to provide an expert report.

Petitioner's expert, Thomas P. Joyce Jr., submitted his expert report on November 15, 2007. That report generally did not take issue with the fingerprint evidence offered at trial but suggested that it might be possible to subject the portion of the tape where the fingerprint had been found (previously found to contain DNA from fingerprint analyst Kim Stevens) to additional DNA testing, including but not limited to YSTR testing. November 15, 2007 Joyce Report at 2.[3]

---

[3] Notably, Joyce's report discusses these options after mentioning "changes in the technology of DNA analysis since 2003." His report indicates that he was proposing to test any remaining extract from the fingerprint area of the duct tape "if based on current DNA technology there is a reasonable chance at locating other DNA profiles." *Id.*

5

YSTR (or Y-STR) testing is a kind of DNA testing that only analyzes Y (male) chromosomes. YSTR testing is not as discriminating as testing for nuclear DNA, so it is somewhat less effective at producing matches, but it is a sophisticated form of DNA testing that sometimes yields results from a smaller sample than is ordinarily required for DNA testing. *See* November 15, 2007 Joyce Report at 2.

On February 6, 2008, YSTR testing was ordered by agreement to be performed on the remaining extract from the area of the duct tape where the fingerprint was found (designated as "Item 31F"). The result of that test was that there was male DNA present, and further analysis excluded Olland Reese as the donor of that material.

On June 27, 2008 petitioner filed a revised amended petition dropping many of his previous claims of ineffectiveness but reiterating earlier claims that trial counsel had been ineffective in not retaining an expert to audit the results of the State's DNA testing and have independent DNA tests performed and that trial counsel had failed to present expert testimony concerning the latent fingerprint found on the duct tape. Revised Amended Petition dated June 16, 2008 ¶¶ 1(a) and 1(b).[4]

4.   Evidence at Post Conviction Hearing

The evidence at the post-conviction hearing showed that in preparation for trial, Reese's defense counsel, Andrews Campbell, sought and received authorization to retain experts from the Henry Lee Institute of Forensic Science, which is affiliated with the University of New Haven in Connecticut. In this connection the court file in CR-02-73 contains a January 22, 2003 letter from attorney Campbell to the court reciting the need for DNA expertise and attaching a January 22, 2003 letter from Dr. Albert Harper,

---

[4] The revised amended petition also asserted one additional ground, which was not pursued at the post conviction hearing.

the director of the Henry Lee Institute. Dr. Harper's letter specifically suggested that a DNA expert review the State's analysis and that the raw DNA date be provided to the defense. Dr. Harper's letter went on the state that the Henry Lee Institute was prepared to supply the needed expertise, including a DNA specialist.

In March of 2003 Campbell wrote to the State Crime Lab to advise that Dr. Harper would be visiting the Lab on April 1, 2003 and requesting that all materials, including the electropherograms derived during the DNA analysis, be available at that time.[5] Letter dated March 12, 2003 from Campbell to Shargo (contained in State's Post-Conviction Ex. 2). After his visit Dr. Harper wrote to Campbell to request that the defense experts be provided with the laboratory bench notes with respect to the State's DNA analysis and an electronic copy of the electropherograms derived during the DNA testing. Letter dated April 8, 2003 (contained in State's Post-Conviction Ex. 2). That request was in turn conveyed to the prosecutor by Campbell (see letter dated April 14, 2003 in State's Post-Conviction Ex. 2) and resulted in the transmittal from the State Crime Lab to Dr. Harper on April 17, 2003 of copies of the bench notes, protocols used, and electropherograms relating to all DNA testing that had been performed as of that date. Memo dated April 17, 2002[6] from Cathy MacMillan at the Crime Lab to Dr. Harper (also contained in State's Post-Conviction Ex. 2).

With specific reference to the portion of the duct tape containing the partial print, the evidence demonstrated that after the State had performed finger and hand print analysis on the duct tape without finding any match, the State eventually obtained the permission of defense counsel to perform DNA analysis. Consent from the defense was necessary because DNA testing of the area of duct tape that contained the print would

---

[5] The exhibits at the post-conviction hearing refer interchangeably to "electropherograms" and "electroferrograms." As far as the court can tell, scientists use both spellings.
[6] The 2002 date is a mistake and should read "2003."

result in destroying the print, although a photograph was taken of the print before the DNA analysis was performed.

In order to obtain a DNA extract from the duct tape, forensic DNA analyst Cathy MacMillan removed a 3.5cm x 1.5cm swatch of the duct tape that encompassed the partial print, cut that swatch up, and placed the pieces in sterile tubes for DNA extraction. The resulting extracts were then combined and analyzed. As both Ms. MacMillan and defense expert Lawrence Presley noted, *see* State's Post Conviction Ex. 4 at page 1; State's Post Conviction Ex. 6 at page 1, this procedure meant that it cannot be determined whether the DNA found was from the sticky side of the tape (where the partial print had been found) or from the smooth side.

In this connection, the evidence also showed (State's Post Conviction Ex. 7) that the partial print was along an edge of the tape. The swatch of the tape that was cut up and subjected to extraction for DNA analysis thus included the sticky side where the partial print was located, the other (smooth) side of the tape, and a portion of the edge of the roll.[7]

When DNA was extracted from the swatch and analyzed, a DNA profile was obtained that was consistent (five loci) with fingerprint examiner Kim Stevens. *See* report of Cathy MacMillan dated April 23, 2003 in State's Post Conviction Exhibit 1. That finding was recorded in the crime lab's contamination log and was duly reported to defense counsel. Moreover, copies of the worksheets and electronic data from MacMillan's DNA analysis of Item 31F were sent to defense expert Albert Harper on

---

[7] As far as the court can tell from State's Trial Exhibits 24 and 31, moreover, the portion of the tape containing Item 31F had not been covered by other tape at the time Green's body was found.

8

April 28, 2003. Petitioner's Post Conviction Exhibit 1.[8] This was approximately three months prior to the trial.

The extracted sample from item 31F was retained and was therefore available when YSTR testing was proposed during the post-conviction proceeding and thereafter yielded a finding that the extract from Item 31F contained male DNA not matching that of Olland Reese.

### 5. Claim of Ineffectiveness

Petitioner is essentially arguing that trial counsel was ineffective in not having taken steps that would have led to YSTR testing prior to trial. On this issue the court finds that trial counsel did not demonstrate incompetence that resulted in performance below what might have been expected from an ordinary defense attorney.

First, although YSTR testing was being offered by at least one private lab during 2003, YSTR testing was still in its infancy at the time of trial.[9] In this context, it is notable that the idea of performing YSTR testing was not originally raised in Reese's post conviction petition, filed with the assistance of his present counsel in June 2006 and was not proposed until November 2007 – more than a year after the petition was filed and more than four years after trial. At the time of Reese's trial, YSTR testing was not an obvious avenue even to forensic experts, let alone to ordinary defense counsel.

Second, the record shows that trial counsel for Reese took the appropriate steps by retaining the Henry Lee Institute and that the Institute had undertaken to review the

---

[8] As noted above, Dr. Harper had previously visited the Crime Lab and had been provided with copies of all of the notes, DNA protocols, and electronic data that had been generated before MacMillan began analyzing Item 31F. At that time MacMillan was still working on item 31F. *See* memo from MacMillan to Harper dated April 17, 2002 (contained in State's Post-Conviction Ex. 2) ("I am in the final stages of running sample L02-385-31F").

[9] *See* Joyce Report of November 15, 2007, discussing YSTR testing in the context of advances in DNA technology.

State's DNA analysis. Dr. Harper was provided with the Crime Lab's test results and with the Crime Lab's worksheets and electronic data (electropherograms) relating to all the DNA analysis performed, including the analysis performed on item 31F. There is no evidence that the defense experts ever suggested YSTR testing or faulted the DNA analysis performed by the Crime Lab. Indeed, there is evidence in the record that Dr. Harper informed Attorney Campbell that

> [t]he analytical work of the Maine State Police Forensic Laboratory was thoroughly documented and conducted with appropriate scientific procedures.

June 26, 2003 letter from Harper to Campbell (last attachment in State's Post Conviction Ex. 2). Dr. Harper's letter went on to state that "[t]he DNA evidence is competently analyzed." *Id.*

It was not ineffective for trial counsel, faced with complicated scientific issues in an evolving field such as DNA, to consult forensic experts and rely on them to identify any viable scientific avenues of inquiry. No evidence exists that Attorney Campbell was ever given any reason to consider the use of YSTR testing.

There is one subsidiary issue that emerged during the post conviction hearing. The electropherogram results obtained during the State's DNA analysis of the extract from Item 31F did show an indication that Item 31F contained a trace amount of male DNA based on what MacMillan described during the post-conviction proceeding as "a very small Y peak." State's Post Conviction Exhibit 4 (July 9, 2008 MacMillan report). However, this amount was well below the threshold necessary for the Crime Lab to report any result and was not mentioned in the Lab's DNA report on Item 31F (April 23, 2003 report contained in State's Post Conviction Exhibit 1).

The possible Y peak does appear on the electropherogram which was sent to defense expert Albert Harper prior to trial. (*See* final attachment to MacMillan's July 9,

10

2008 report – State's Post Conviction Ex. 4). Assuming for purposes of argument that the electropherogram might have been sufficient to alert a scientific forensic analyst in 2003 that Item 31F might contain a mixed DNA profile including some male DNA, Attorney Campbell was never alerted to that possibility. There is no evidence Campbell personally reviewed the electropherogram, nor was he ineffective in leaving that task to the defense experts. Campbell could not reasonably have been expected to spot the possible Y peak or understand its significance if he had reviewed the electropherogram.

On issues of this nature, defense counsel did not fall below the required standard of performance in relying on review by the experts he had retained with the expectation that, if the electropherogram exhibited any anomalies, the experts would flag them.[10]

6. Prejudice

On the issue of prejudice, the defense contends that evidence of male DNA (from a person other than Reese) on the duct tape used to bind Cody Green's wrists would have been likely to affect the outcome of the trial. The State disagrees, arguing that the DNA could have come from the sticky edge of the roll and could have been left by anyone who had handled the tape at any time before it was used to bind Green. Having found that trial counsel did not perform ineffectively under the *Strickland* standard, the court does not at this time have to reach the issue of whether the YSTR evidence would have been likely to change the outcome of the trial.

---

[10] The copy of the electropherogram attached at the end of MacMillan's July 9, 2008 report (State's Post Conviction Exhibit 4) contains an arrow identifying the possible Y peak. Although the record is not entirely clear, the court infers that this arrow was added by MacMillan in 2008 for illustrative purposes and did not appear on the electropherogram as originally sent to Dr. Harper. Even if it did, however, that does not change the conclusion that Attorney Campbell was not ineffective in relying on the defense experts to review the electronic data and the finding that he was never notified of any possible male DNA from Item 31F.

11

The petition for post conviction relief is denied. Reese's DNA motion pursuant to 15 M.R.S. § 2137 remains pending.

DATED:     February 27, 2009

_____

Thomas D. Warren
Justice, Superior Court